**Joanna MASHER, Appellant**

v.

**Michael J. ASTRUE, Commissioner of Social Security.**

No. 08–4850.

United States Court of Appeals, Third Circuit.

Argued Sept. 30, 2009.

Filed: Dec. 7, 2009.

Wilbur H. Seitzinger, Jr., Esquire, (Argued), Seitzinger & Randazzo, P.C., Bala Cynwyd, PA, for Appellant.

Anne Von Scheven, Esquire, (Argued), Assistant Regional Counsel, Special Assistant United States Attorney, Eric P. Kressman, Esquire, Acting Regional Chief Counsel, Patricia M. Smith, Esquire, Supervisory Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, PA, Region III, Martin C. Carlson, Esquire, United States Attorney, Kate L. Mershimer, Esquire, Assistant United States Attorney, United States Attorney's Office, Middle District of Pennsylvania, Scranton, PA, for Appellee.

Before: RENDELL, AMBRO and WEIS, Circuit Judges.

## OPINION

WEIS, Circuit Judge.

Joanna Masher appeals the District Court's order affirming the denial of her Social Security disability benefits claim. We conclude that there is insufficient evidence supporting the denial of benefits. The ALJ failed to give proper weight to the treating physician's opinion, disregard-ed objective medical evidence, and improperly substituted her own judgment for that of the experts. Accordingly, we will remand for further proceedings.

## I.

Masher, age 33, is a high school graduate. From 2000 to 2004, she worked as a "jam runner," or conveyor operator, which involved repeated scanning and pushing of stock weighing up to 100 pounds onto a conveyor system.[1] In 2003, she was diagnosed with bilateral carpal tunnel syndrome.[2] She had surgery on her right hand that June and was out of work for several months.

Soon after Masher returned to work, she began experiencing the same pain that had led to her carpal tunnel surgery. In November 2003, it was clear that the surgery had not solved her problem, and her physician, Dr. Vincent DiGiovanni, ordered EMG and nerve conduction tests. The results showed neuropathy in the nerves affecting both wrists, right elbow and right brachial plexus.

Masher requested and was given a different job with the same company, performing light office tasks which, though repetitive, required less lifting. However, her condition continued to deteriorate. In March 2004, Dr. DiGiovanni concluded that Masher had both thoracic outlet syndrome[3] and bilateral carpal tunnel syn-

---

1. Masher also has worked as a playground attendant and a department store cashier and stocker.

2. Carpal tunnel syndrome is

"[a] condition resulting from pressure on the median nerve as it traverses the carpal tunnel[, a space deep within the palmar surface of the wrist], usually by fibers of the transverse carpal ligament. The condition is characterized by pain, tingling, burning, numbness, etc. in the areas supplied by the nerve, i.e., in the skin of the palm, fingers, wrist, etc. There may also be swelling of the fingers and atrophy of some of the muscles of the hand, especially those at the base of the thumb."

1 J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* C–95 (December 2008).

3. Thoracic outlet syndrome, or Naffziger's syndrome, is "[a]n abnormal condition marked by pain in the shoulder, pain extending down the arm, and, sometimes, pain in the back of the neck. There may also be spasms of blood vessels." 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* N–4 to N–5 (December 2008). These

drome. He referred her to Dr. Allen Togut, a thoracic specialist.

Dr. Togut saw Masher in April 2004. After performing a comprehensive physical and neurological examination, he confirmed the diagnoses of bilateral carpal tunnel and thoracic outlet syndromes. At the end of this three-hour exam and consultation, Dr. Togut told Masher that "she was totally disabled for any gainful employment."

Masher ceased her employment in April 2004, but, contrary to Dr. Togut's recommendation, returned two months later on a part-time basis, reducing her workday from eight hours to six and finally to four. However, despite the change in working conditions, she continued to experience pain and loss of sensation in her hands.

Finally, on August 25, 2004, Masher quit work altogether. She applied for disability benefits on August 18, 2005, contending that her disability began the previous August.

At a hearing before an ALJ in March 2007, Masher testified at length. She described her pain as similar to "a toothache," and often accompanied by "numbness and tingling" in her right hand, which frequently caused her to drop what she was holding. She also reported headaches and backaches on the right side, twinges of pain under her right arm, stiffness in her right wrist, elbow and shoulder, and tightness on the right side of her neck. Finally, she noted a "pull sensation" in her right arm and shoulder that would occur when she reached overhead. These symptoms were exacerbated by cold and anxiety.

Masher testified that she took medications for pain, depression, and anxiety, and that the pain pills were effective so long as she limited her daily activities.

However, the medications made her "really tired" and sometimes affected her ability to "think straight." In addition, she reported waking up because of pain several nights per week. For these reasons, she usually napped at least once and sometimes twice each day.

With respect to daily activities, Masher testified that she could sit and stand for about 20 minutes, but could write for only 20 seconds at a time. She was able to attend to her basic personal grooming, but often cut corners where her hair and makeup were concerned. Her wardrobe, too, had been affected by her medical condition; for example, she frequently wore sweatshirts with a front pocket to give support to her right hand and wrist when she moved. She did some housekeeping but needed to work in short bursts to avoid nighttime pain, which led to sleeplessness and exhaustion. In addition, she had delegated a number of tasks to her husband and children that she was no longer able to complete. She could not drive long distances because her hands would fall asleep. In sum, Masher testified that, by significantly circumscribing her daily activities, she could limit her discomfort to manageable levels.

In addition to her testimony, Masher presented six reports and notes of almost a dozen office visits prepared by Dr. Togut, who treated her between April 2004 and February 2007.

The first report, dated April 29, 2004, described his initial evaluation of Masher, during which he examined the range of motion in her neck; the effects of certain movements on her neck, shoulders and arms; the effects of applied pressure to key nerve points on her neck, shoulders and arms; her ability to sense vibrations

---

symptoms are "caused by pressure on the nerves of the brachial plexus[, a large network of nerves located in the neck that supplies the nerves to the arm muscles,] and the subclavian artery by an excessively tense muscle of the neck." *Id.*

on both hands and arms; her deep tendon reflexes; and muscle strength in both shoulders and arms. His findings supported the diagnoses of bilateral carpal tunnel and thoracic outlet syndromes. This report also included Dr. Togut's conclusion that Masher was "totally disabled for any gainful employment."

Dr. Togut's later reports and notes tracked Masher's condition and reiterated his opinion that she should not return to work, because the strain of working—even in a part-time, sedentary capacity—would aggravate her medical problems. These reports demonstrate that this opinion was based on Masher's subjective complaints, which Dr. Togut repeatedly confirmed through the use of objective medical tests, as well as the difficulties she had in 2004 doing light work at reduced hours.

Moreover, Dr. Togut's February 2005 report indicated that, although Masher had been out of work for nearly six months, her condition was not only worsening on the right side of her body but also spreading to the left. Although she had reported occasional numbness and tingling in the left hand as early as April 2004, by February 2005, the pain in that hand was increasing. Masher also reported, for the first time, dropping objects held in her left hand, pain in the left elbow, and numbness of the left fingers. These complaints were consistent with the results of Dr. Togut's objective tests. For example, range of motion in Masher's neck was reduced compared to April 2004, and the "nerve tension test" performed on the left brachial plexus likewise suggested "a problem on the left."

The ALJ also reviewed the May 2004 report of Dr. Steven Mandel, a neurologist who performed a one-time Independent Medical Evaluation of Masher in connection with a dispute related to her worker's compensation benefits. Dr. Mandel agreed with the diagnoses of bilateral carpal tunnel syndrome and right thoracic outlet syndrome, but believed that Masher could nevertheless return to modified duty.

Dr. Mandel completed a "Work Capabilities form" and reported that Masher could sit, stand or walk continuously for eight hours; could not perform any fine manipulation with either hand; could perform "[s]imple [g]rasping" with both hands but could not push or pull more than five pounds with either; and could occasionally reach above shoulder height. Some of Dr. Mandel's recommendations appear to be inconsistent. For example, he wrote that although Masher could "never" lift 20 pounds or more, she could "frequently" carry 20, 50, or 100 pounds.

Also before the ALJ was an assessment form from a non-examining consulting physician, dated September 20, 2005. It is unclear what medical evidence, if any, the non-examining physician reviewed. However, he concluded that Masher was capable of sedentary work and recommended comparatively few workplace or exertional limitations. For example, he opined that Masher was capable of "occasionally" lifting 20 pounds, had no problems with gross or fine manipulation or sensation in her fingers and hands, and was "unlimited" in her ability to push and pull, findings that were inconsistent with Dr. Mandel's and Dr. Togut's. The non-examining physician did not complete the portions of the evaluation form requesting evidentiary support for his conclusions.

Finally, the ALJ heard from a vocational expert, who testified that a person of Masher's age, education, experience, and physical limitations as characterized by the ALJ [4] might be able to perform "basic

---

4. Contrary to the diagnosis of both Dr. Togut and Dr. Mandel, the ALJ disregarded Masher's left-hand carpal tunnel issues and in- structed the vocational expert to assume "[n]o limitation of handling or fingering" with respect to the left hand.

hand packer positions." She stated that there were hundreds of these jobs in the region.

The ALJ denied Masher's claim. Although Dr. Togut was the only physician on record to examine Masher after the alleged onset of her disability, the ALJ declined to give the doctor's opinion any significant weight, citing three reasons for this decision. First, she deemed Dr. Togut's view as to Masher's disability "merely a conclusory finding apparently based on the claimant's subjective complaints." Second, "an opinion on the ultimate issue of disability is reserved for the Commissioner." Finally, she stated that "Dr. Togut's opinion is not supported by objective medical evidence of record" since Dr. Mandel made "essentially" the same diagnosis but did not find Masher to be totally disabled.

The ALJ rejected the diagnosis of both Dr. Togut and Dr. Mandel that the carpal tunnel syndrome was bilateral. In fact, she found that "there [wa]s no objective evidence ... that show[ed] any gait, range-of-motion, sensory, motor or neurological deficit" on the left side. Therefore, she "accept[ed] Dr. Mandel's opinion as modified ... limit[ing] the restrictions to the right side only which is in conformity with medical records." Based on these determinations, the ALJ concluded that Masher could perform sedentary unskilled work with restrictions.

On appeal, the District Court declined to overturn the Commissioner's ruling. Masher sought review here.

## II.

The District Court had jurisdiction to review the final decision denying disability benefits based upon 42 U.S.C. § 405(g). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Our role, like that of the District Court, is to determine whether substantial evidence supports the Commissioner's decision. *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir.2008).

## III.

Masher contends that substantial evidence does not support the denial of benefits, because the ALJ: 1) failed to attribute proper weight to the opinion of her treating physician, Dr. Togut; 2) mischaracterized Dr. Togut's opinion as conclusory and unsupported by objective medical evidence; and 3) gave more weight to the opinion of Dr. Mandel, who examined Masher one time, three months *before* the alleged onset of her claimed disability.

"An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Brownawell*, 554 F.3d at 355 (citation and internal quotation marks omitted). The ALJ is not permitted to "make speculative inferences from medical reports[,]" nor can she "employ her own expertise against that of a physician who presents competent [expert] evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999). "[C]ontradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright." *Brownawell*, 554 F.3d at 355.

Where the evidence conflicts, "the ALJ may choose whom to credit[,] but [she] 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). To the contrary, she "must consider all the evidence and give some reason for discounting [that which] she rejects." *Id.*

Here, it appears that the ALJ's refusal to give significant weight to the reports of Dr. Togut was influenced to some degree by his repeated use of the word "disabled."

It is certainly true, as the ALJ stated, that "an opinion on the ultimate issue of disability is reserved for the Commissioner." But, the ALJ's apparent disapproval of the doctor's use of the term to describe Masher's condition from a medical standpoint overlooks the differing contexts in which the word can be used.

The mere utterance of the word "disabled" does not make a physician's opinion "conclusory." *See Brownawell*, 554 F.3d at 355–56 (ALJ failed to give appropriate weight to opinion of treating physician, who repeatedly opined that claimant was "disabled"). Rather than focusing on the doctor's choice of words, the ALJ was obligated to examine the substantive evidence on which the physician's conclusion was based.

Dr. Togut was, significantly, the only physician to examine Masher after August 2004, the alleged onset of her claimed disability. He repeatedly performed a number of objective medical tests, the results of which were memorialized at length in his reports of April 2004 and February 2005. The result of these tests demonstrated that Masher was increasingly symptomatic on the left side and getting worse, not better, on the right. Furthermore, based on his ongoing treatment, Dr. Togut was aware that Masher had tried, without success, to return to work, even after he recommended that she quit. He also was familiar with the effects on Masher of daily household tasks and increased stress and physical activity.

Access to this type of information is often exclusive to the treating physician. For that reason, we have consistently held that the ALJ must give "controlling weight" to the opinion of a treating physician unless that opinion is not supported by "medically acceptable clinical and labo-

ratory diagnostic techniques [or] is . . . inconsistent with the other substantial evidence in . . . [the] record." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir.2001) (quoting 20 C.F.R. § 404.1527(d)(2)). Here, Dr. Togut conducted numerous tests; indeed he performed the same objective tests as Dr. Mandel, whose opinion was adopted by the ALJ. On this record, we are not persuaded that the ALJ gave sufficient deference to the opinion of Dr. Togut. *See Plummer*, 186 F.3d at 429 (ALJ "cannot reject evidence for no reason or for the wrong reason" (quoting *Mason*, 994 F.2d at 1066)). Accordingly, remand is required.

In light of this holding, we need not address the question whether sufficient evidence supports the ALJ's specific findings as to the type of employment available to Masher. However, on remand, the ALJ should evaluate all the evidence and explain the basis for her conclusions. *See Fargnoli*, 247 F.3d at 42–44.

Here, in concluding that Masher was capable of reentering the work force, albeit with numerous restrictions, the ALJ appeared to disregard several inconsistencies in the findings of Dr. Mandel and the nonexamining physician. She also rejected the unanimous medical determination that the carpal tunnel syndrome was bilateral, concluding instead that Masher had no issues with her left hand or arm.[5] This conclusion, in turn, was one of the "assumptions" on which the vocational expert based her opinion that Masher could return to gainful employment.

We will reverse the District Court's grant of summary judgment and remand

---

5. We note that, in so doing, the ALJ cited Dr. DiGiovanni's notes and reports from 2003, some two years before Masher applied for disability benefits and well before she claimed that her alleged disability manifested.

for proceedings consistent with this opinion.